IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JAMES LEE CECIL, JR., | ) | |
|     Plaintiff, | ) | Civil Action No. 7:18-cv-00641 |
| | ) | |
| v. | ) | |
| | ) | By:  Elizabeth K. Dillon |
| CRYSTAL LARGE, | ) |     United States District Judge |
|     Defendant. | ) | |

**MEMORANDUM OPINION**

Plaintiff James Lee Cecil, Jr. filed this prisoner civil rights action pursuant to 42 U.S.C. § 1983. In his second amended complaint, filed June 28, 2019, Cecil named Crystal Large, a nurse practitioner, as the sole defendant. (Am. Compl., Dkt. No. 50 ¶¶ 5–8.) He alleges that, since arriving at SWVRJ in Duffield in December 2018, he has requested treatment for his Hepatitis C. Cecil contends that Large failed to provide the needed treatment and instead allowed him to suffer pain and symptoms associated with his Hepatitis C for approximately seven months. The court construes Cecil's complaint as stating an Eighth Amendment claim of deliberate indifference to his serious medical needs.

Pending before the court is Large's second motion for summary judgment (Dkt. No. 145), which is fully briefed. Also before the court is Large's motion to strike. (Dkt. No. 159.) For the reasons set forth herein, Large's motions for summary judgment and to strike will be granted.

I.  BACKGROUND

**A. Procedural Background**

    **1. Large's first motion for summary judgment**

The court previously considered and denied Large's first motion for summary judgment. (Dkt. No. 107.) In that motion, Large argued that she was not deliberately indifferent to Cecil's Hepatitis C. The court, however, denied that motion because of a dispute of fact and lack of

information as to why Large did not refer Cecil for a Fibroscan, a liver ultrasound, following the results of the lab work done in February 2019 given the VDOC's January 2019 Guidelines for Hepatitis C treatment which appeared to qualify him for a Fibroscan because of an AST-to-platelet-ration-index (APRI) of 0.85.  In considering this second motion for summary judgment, the court now has additional information which resolves this dispute of fact.

2. **Large's motion to strike**

Before considering the record of undisputed facts for summary judgment purposes, the court must resolve Large's motion to strike portions of Cecil's response in opposition to her summary judgment motion.  Two days before the discovery deadline, Cecil filed a motion for an extension of time to complete discovery.  This motion was granted in part and denied in part by U.S. Magistrate Judge Hoppe, who granted Cecil leave to depose Large (which occurred) and a Rule 30(b)(6) designee for SWVRJA (which did not occur) after the close of discovery and ruled that testimony from these depositions could not be used to support dispositive motions or responses thereto because the dispositive motion deadline had passed and would not be extended.  Judge Hoppe reiterated this holding at two additional hearings regarding scheduling of deposition.

Cecil asserts that he believed he could use Large's deposition testimony in opposition to the summary judgment motion and that the limitation "does not comport with [his] memory of those hearings."  (Dkt. No. 166 at 4.)  Nonetheless, the ruling was not appealed, and Cecil's counsel represented at the hearing that the court could ignore any references to the stricken deposition testimony without undermining Cecil's position in opposition to Large's motion for summary judgment.  Therefore, the court will grant Large's motion, strike the references to Large's deposition testimony, and disregard any evidence those references may directly or impliedly support.

**B. Undisputed Material Facts**

Large is a nurse practitioner, not a medical doctor, employed by Mediko, Inc., a third-party contractor that provides medical services to jails and prisons. Large has worked in the correctional setting since 2013. As a nurse practitioner, also known as an advance practice provider or "physician extender," Large works alongside doctors to assess patients in sick call. (Affidavit of Crystal Large (Large Aff.) ¶ 2, Dkt. No. 146-1.)

During the relevant time periods, Large cared for inmates at the Southwest Virginia Regional Jail (SWVRJ) facilities of Abingdon, Duffield, Tazwell, and Haysi. (Large Aff. ¶ 3.) Cecil was booked at Haysi, spent several months at Duffield, and was transferred to Abingdon before his final transfer to New River Valley Regional Jail, where Cecil remained incarcerated at the time this motion was briefed. (Cecil Dep. 5, 6, Dkt. No. 146-2.)

Prior to incarceration, Cecil was originally diagnosed with Hepatitis C on September 5, 2014, following bloodwork ordered by his doctor at a routine checkup. He does not remember if he was experiencing symptoms at the time of his diagnosis. (Cecil Dep. 11–12.) Cecil did not seek treatment for his Hepatitis C until nearly four years later, when he presented to the Carilion Infectious Disease (ID) Clinic on November 8, 2018. (Ex. C at 59–62, Dkt. No. 146-3.) He underwent bloodwork indicating a viral load of 4,860,000 and a Hepatitis C genotype of 1a. (*Id.*) Cecil planned to initiate treatment at the ID Clinic following the bloodwork. (Cecil Dep. 13.)

However, Cecil was arrested on November 15, 2018, and booked on November 20, 2018. (Ex. D at 330, Dkt. No. 146-4.) When arrested, Cecil was infected with Hepatitis C and had a prescription to begin treatment with Direct Acting Antivirals (DAAs). (Cecil Dep. 13–14.) At his intake screening on November 17, 2018, Cecil identified Hepatitis C as part of his medical history. (Ex. E at 33–38, Dkt. No. 146-5.) Once incarcerated, Cecil repeatedly requested treatment for his Hepatitis C. (*Id.* at 19.)

3

On November 29, 2018, medical staff at Duffield examined Cecil for a rash. During the visit, Cecil indicated he felt his Hepatitis C was worsening due to fatigue and "pain in the liver." (*Id.*) Cecil does not remember feeling fatigue or pain prior to his incarceration. (Cecil Dep. 17.) Nursing staff informed Large of Cecil's complaints. Large ordered Benadryl for the rash. This was Large's first involvement in Cecil's care. Medical staff placed Cecil on the list to be seen by a physician. (Ex. E at 19.)

On December 4, 2018, Charles Hurlburt, MD, the facility physician, saw Cecil. (*Id.* at 19, 90.) Based on Cecil's report that he had sought treatment at Carilion Clinic, Dr. Hurlburt instructed medical staff to request Cecil's records from the Carilion Clinic. Because Carilion's Gastroenterology Clinic (not the ID Clinic) typically treats Hepatitis C, the release form was addressed to the Gastroenterology Clinic. Cecil signed the release. (*Id.*)

On December 10, 2018, Cecil reported complaints of pain in his forearm and an abrasion in the wrist area. (*Id.* at 19.) While being examined for left wrist pain, he again expressed concerns about his Hepatitis C. (*Id.*) Bloodwork was ordered and results returned on January 11, 2019. The results showed a fibrosis score of .96 and an AST-to-platelet-ration-index (APRI) of 0.85.

The SWVRJ guidelines for Hepatitis C used by Mediko in January 2019 were evolving. While SWVRJ is not a Virginia Department of Corrections (VDOC) facility, so VDOC guidelines were not mandatory, Mediko consulted the "Virginia Department of Corrections Guideline for Chronic Hepatitis C Diagnosis/Management" (VDOC Guidelines) for guidance. [1] (Ex. H, Dkt. No. 146-8.) Pursuant to those VDOC Guidelines, two different protocols were recommended for liver ultrasounds (Fibroscan) – one for persons already diagnosed with Hepatitis C and one for persons

---

[1] Cecil maintains that Large admitted that VADOC policies governed the SWVRJ for treatment of Hepatitis C. In support, Cecil confusingly cites one of Large's proposed findings of fact, which states: "The guidelines at SWVRJ facilities in 2019 were evolving. A copy of the Hepatitis C guidelines Mediko used in January 2019 is attached as Exhibit H." (Dkt. No. 146, ¶ 29 at p. 6.) The court does not accept Cecil's argument that this constitutes an admission by Large that she was required to follow VADOC policies.

without a diagnosis.  Persons with an established diagnosis of chronic active Hepatitis C, like Cecil, qualify for a liver ultrasound if they have clinical cirrhosis, APRI ≥ 1.5 and fibrosis ≥ 3.25, or a Fibroscan score of ≥ 9.0.  (Ex. H at 3.)  Persons without a diagnosis qualify for a liver ultrasound if their APRI is ≥.5 and < 1.5 OR if their fibrosis score is ≥ 1.45 and ≤ 3.25.  (Ex. H at 4.)  Cecil, who had an established diagnosis of chronic active Hepatitis C, did not qualify for a liver ultrasound because he did not have clinical cirrhosis and his APRI was only 0.85.  He had no Fibroscan score because he had not undergone a Fibroscan.

On February 10, 2019, Cecil reported to sick call for complaints related to Hepatitis C, wrist pain, and soreness under his arm.  (*Id.* at 16, 85.)  The nurse consulted Large, who asked to evaluate Cecil.  (*Id.*)  Large met with Cecil on February 14, 2019.  (*Id.* at 16–17, 84–85.)  At that time, she reviewed the results from his January 11, 2019 bloodwork.  (Large Aff. ¶ 5.)  Using the guidelines in place at the time, Large determined that Cecil did not qualify for further diagnostic testing and explained to him that he would be re-tested in three months.  This was because Cecil had already been diagnosed with Hepatitis C and had an APRI of 0.85.  The guidelines stated that an inmate already diagnosed with chronic active Hepatitis C is eligible for a liver ultrasound only if his APRI is greater than 1.5.[2]  During her physical exam, she noted Cecil was in no acute distress and that his abdomen was soft and non-distended, with mild tenderness in the right upper quadrant.  There was no limitation to his mobility, and his vitals were normal.  Large called the Gastroenterology Clinic to inquire into the status of the records request and was informed that the clinic had no record of Cecil as a patient.  Large also ordered further bloodwork for Cecil.  This was Large's last involvement with Cecil's care, other than renewing an order for ibuprofen.  (*See id.*)

---

[2] In denying Large's first motion for summary judgment, the court mistakenly used the guidelines that applied to those inmates without a Hepatitis C diagnosis (Dkt. No. 107 at 3) instead of the guideline for inmates with an established diagnosis.

5

On April 30, 2019, Cecil underwent the repeat bloodwork Large had ordered in February. (Ex. E at 17–18.) Dr. Hurlburt reviewed and signed off on the results, which showed a fibrosis score of 1.07 and an APRI of 0.86. (Affidavit of Charles Hurlburt (Hurlburt Aff.) ¶ 7, Dkt. No. 146-6.) These results were not sent to Large, and she did not know about them or review them. (Large Aff. ¶ 6.)

Dr. Hurlburt examined Cecil again on June 26, 2019. During that appointment, Dr. Hurlburt identified the misunderstanding with the records and completed a new release to obtain Cecil's records from the ID Clinic. Dr. Hurlburt explained to Cecil he would initiate Hepatitis C treatment through the ID Clinic, as Cecil had an established relationship with providers there. (Ex. E at 80–81.)

On August 6, 2019, Cecil underwent an ultrasound of the abdomen ordered by Dr. Hurlburt. The ultrasound indicated "a moderate risk of clinically significant hepatic fibrosis, stage F2 and some F3." (Ex. E at 1, 77; Ex. G at 9–12, Dkt. No. 146-7.)

Another facility physician, Joseph Cutchin, MD, met with Cecil on August 27, 2019, to review the results. He indicated Cecil's records had been requested from the ID Clinic. (Ex. E at 80.) Dr. Cutchin saw Cecil again on October 31, 2019, in response to a sick call request from Cecil. Cecil wrote: "I am trying to figure out what in the hell the problem is. Why aren't [sic] I being referred to the hepatology clinic so mark ammonete [sic] can determine whether I fit treatment standards, the dr [sic] hasn't even referred me." When Dr. Cutchin met with Cecil to address his concerns, Cecil left without formulating a plan for initiation of Hepatitis C treatment, stating that his lawyer would intervene. (Ex. E at 79.)

On November 4, 2019, Cecil was transferred to New River Valley Regional Jail. (Cecil Dep. 5.) Mediko is not the health care provider at New River Valley, and thus the Mediko

6

providers no longer had any knowledge or control over Cecil's medical treatment following this date. (Hurlburt Aff. 10.)

Since his transfer to New River Valley, Cecil has been successfully treated and cured of Hepatitis C. (*See* Ex. D.) On May 12, 2020, Cecil met with a physician at the Carilion ID Clinic about starting treatment. (Ex. D at 558–68.) On July 23 or 24, 2020, he began taking Zepatier for treatment of Hepatitis C. (*Id.* at 592.) Following ten weeks of Zepatier therapy, Cecil's bloodwork on October 10, 2020, indicated the Hepatitis C virus was no longer present. (*Id.* at 610–13.)

On November 13, 2020, Cecil's physician at the ID Clinic informed him he was cured of Hepatitis C. (Ex. C at 15–27.) Repeat lab test results on December 30, 2020, confirmed the virus was not present in Cecil's blood. (Ex. E at 102–04.)

## II. DISCUSSION

### A. Summary Judgment Standard[3]

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one that "might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of material fact is "genuine" if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49.

The moving party bears the initial burden of showing the absence of a genuine dispute of

---

[3] Following the summary judgment hearing, Cecil submitted a pro se objection to the conduct of the hearing and other arguments in opposition to summary judgment. (Dkt. No. 167.) Because Cecil is represented by counsel, the court disregards and does not consider this pro se submission. *See, e.g.*, *United States v. Tracy*, 989 F.2d 1279, 1285 (1st Cir. 1993) ("A district court enjoys wide latitude in managing its docket and can require represented parties to present motions through counsel."); *United States v. Lawrence*, CRIMINAL NO. 3:17-CR-149-DPJ-FKB, 2018 WL 6684162, at *1 (S.D. Miss. Dec. 19, 2018) (denying motions because party was "represented by counsel and cannot file motions pro se"); *Mitchell v. Senkowski*, 489 F. Supp. 2d 147, 149 (N.D.N.Y. 2006) ("Several trial and appellate courts have refused to accept *pro se* submissions once an attorney has been retained or assigned.") (collecting cases).

material fact. *Celotex*, 477 U.S. at 323. Once the moving party makes this showing, however, the opposing party may not rest upon mere allegations or denials, but rather must, by affidavits or other means permitted by the Rule, set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c), 56(e). All inferences must be viewed in a light most favorable to the non-moving party, but the nonmovant "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

### B. Cecil Cannot Establish An Eighth Amendment Claim Against Large As A Matter Of Law

"It is beyond debate that a prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment." *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019). To demonstrate deliberate indifference, an inmate must show that (1) he has a medical condition that has been "diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention" and (2) the defendant "had actual knowledge of the plaintiff's serious medical needs and the related risks, but nevertheless disregarded them." *Id.* at 356–57. The first component is an objective inquiry and the second is subjective. *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209–10 (4th Cir. 2017).

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *Farmer v. Brennan*, 511 U.S. 825, 839–40 (1994). "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). To qualify as deliberate indifference, the health care provider's treatment "must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837;

8

*see also Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (explaining that deliberate indifference is "more than mere negligence," but "less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result. It lies somewhere between negligence and purpose or knowledge: namely, reckless of the subjective type used in criminal law").

Cecil admits that he has received treatment for Hepatitis C and is now cured. Nonetheless, a delay in medical treatment may constitute deliberate indifference. *See Smith v. Smith*, 589 F.3d 736, 739 (4th Cir. 2009). The Fourth Circuit has held, although in unpublished decisions, that where a prisoner's claim is based on a delay in treatment, he must also show that the delay caused him to suffer "substantial harm." *Webb v. Hamidullah*, 281 F. App'x 159, 166 (4th Cir. 2008).

Large does not dispute that treatment of Cecil's Hepatitis C is a serious medical need but argues she was not deliberately indifferent to that need. Large reviewed Cecil's January 11, 2019 lab results and applied the guidelines in place at the time to determine that he did not qualify for a liver scan (the next diagnostic test). Cecil alleges that all inmates with an APRI score greater than or equal to .5 are required to have a Fibroscan; Large argues that this is inaccurate because Cecil already had an established diagnosis of Hepatitis C. The undisputed evidence shows that Cecil did not qualify for a Fibroscan under the VADOC Guidelines because of his established diagnosis.[4]

Ultimately, Large acted within her professional judgment as a nurse practitioner, not with deliberate indifference to a serious medical need. Cecil may disagree with the prescribed course of treatment, or the wisdom of the internal guidelines she was following, but mere disagreement between an inmate and a physician over the inmate's proper medical care is not deliberate

---

[4] Medical doctors examined Cecil before and after Large's involvement with Cecil. As a nurse, Large is entitled to rely upon the medical judgment of doctors in following guidelines and in providing treatment. *See, e.g., Corbin v. Movassaghi*, No. 6:22-cv-12, 2022 WL 3579903, at *4 (W.D. Va. Aug. 19, 2022); *Patterson v. Smith*, No. 1:20cv202, 2020 WL 6928614, at *7 (E.D. Va. Nov. 24, 2020).

indifference. *See Scinto*, 841 F.3d at 225; *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) ("Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged.").[5]

Cecil cites as evidence of deliberate indifference Large's failure to follow-up and review the results of Cecil's April 2019 bloodwork. This reflects a misunderstanding about how medical treatment occurs in a prison facility. Large did not have a duty to constantly review Cecil's records. Moreover, Large's interaction with Cecil ended in February 2019. Cecil was receiving treatment from other providers aside from Large, including Dr. Hurlburt, a medical doctor, who reviewed the April 2019 bloodwork in June 2019. Cecil does not provide evidence that he sought, and was denied, attention or treatment from Large.

In denying Large's first motion for summary judgment, the court explained that Large's conduct may have crossed the line from negligence to deliberate indifference by her failure to continue monitoring Cecil because "Large had knowledge, based on lab results that she reviewed and the guidelines she says she was required to follow, that Cecil's condition warranted further testing." (Dkt. No. 107 at 8.) Again, as explained above, there is no longer an issue of whether Cecil required further testing under the guidelines.

Moreover, the parties' dispute over the proper interpretation of the guidelines and their application to Cecil does not create an issue of fact. Even if Cecil should have been referred for an ultrasound in February 2019 pursuant to the VADOC guidelines or some other authority, this referral would not amount to treatment. Indeed, once Cecil was referred for a liver ultrasound in August 2019, long after Large's involvement in this case had concluded, Cecil *still* was not referred for treatment at that point. Instead, Cecil began treatment the following summer, in July 2020, and

---

[5] Cecil asserts that he was told by Dr. Hurlburt that he qualified for treatment at this time. This is inadmissible hearsay that is insufficient to defeat a summary judgment motion. *See, e.g.*, *Hicks v. Ferreyra*, 396 F. Supp. 3d 564, 579 (D. Md. 2019).

he completed treatment in September 2020. Thus, there is no evidence to suggest that Large's failure to refer Cecil in February 2019 delayed Cecil's treatment.

Large also argues that Cecil cannot establish that her alleged deliberate indifference was the cause of his alleged injury. *See Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012) ("[C]onstitutional torts, like their common law brethren, require a demonstration of both but-for and proximate causation."); *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009) (in addition to alleging a defendant's deliberate indifference to his medical needs, plaintiff must also prove causation between that indifference and his injuries). Large argues that expert testimony is required to establish causation in this case. *See Alberson v. Norris*, 458 F.3d 762, 765–66 (8th Cir. 2006) ("Where the complaint involves treatment of a prisoner's sophisticated medical condition, expert testimony is required to show proof of causation."). However, Large maintains that neither of Cecil's experts, Dr. Susan Lawrence or Dr. Paul Gaglio, opine that her alleged failure to order a liver ultrasound in February 2019 proximately caused Cecil's alleged injuries, nor that Large was deliberately indifferent.

For example, Dr. Lawrence, a doctor and civil rights plaintiffs' counsel, refers generally to allegedly negligent medical treatment by "jail medical staff." Dr. Lawrence criticizes the actions of various providers, but she does not mention Large except to criticize the dosage of Tylenol she administered to Cecil. Dr. Lawrence opines that the "breach of care caused the progression of Mr. Cecil's liver disease" and is a "direct and proximate cause of Mr. Cecil's needless disease progression and physical and emotional suffering." (Dkt. No. 146-10 at 18.) Nowhere does Dr. Lawrence link Large's allegedly deliberately indifferent actions to any of Cecil's injuries. Similarly, Dr. Gaglio opines that Cecil not being "prioritized to receive therapy" may have been "associated with progression of HCV fibrosis," and "[f]ailure to treat HCV, to a reasonable degree of medical certainty was associated with inappropriate prolongation of his symptoms of abdominal

11

pain and rash." (Dkt. No. 146-11 at 2, 3.)  Like Dr. Lawrence, Dr. Gaglio does not connect Cecil's injuries to any of Large's actions or inactions.  This is not surprising given that, as the court discussed above, there is nothing in the record to suggest that Large's actions had any effect on the speed with which Cecil received the treatment he eventually received.

Cecil tries to rehabilitate these reports by stating that Drs. Lawrence and Gaglio both testified that the delay in treatment, due to Large's refusal to refer him for a Fibroscan and treatment based thereon, caused his injuries.  (Dkt. No. 156 at 18.)  Cecil cites only to the expert reports, which, as described above, are not specific to Large.  Cecil also points to a generic statement in Dr. Lawrence's report that she was providing an opinion as to the actions of defendants in this case. (Dkt. No. 146-10 at 13 ("In this report, I have been asked to provide an opinion as to whether the care provided to Mr. Cecil by defendants was negligent and deviated from the applicable standards of care.").)  Again, this statement is not specific to Large because the content of Dr. Lawrence's report mentions Large only with respect to her administration of Tylenol to Cecil.

In sum, Cecil's expert reports fail to create an issue of fact on causation, and Large is entitled to summary judgment on this basis.

### III.  CONCLUSION

For the reasons stated above, Large's motions to strike and for summary judgment will be granted.  An appropriate order will be entered.

Entered: January 12, 2023.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge